UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

PAMELA VICKARYOUS,

    Plaintiff,

v.                                                                Case No:   2:21-cv-903-JLB-NPM

MASON CLASSICAL ACADEMY, INC.,
KELLY LICHTER, and DAVID BOLDUC,

    Defendants.

## ORDER

The Magistrate Judge has entered a Report and Recommendation, recommending that Plaintiff Pamela Vickaryous's Motion for Temporary Reinstatement under Florida's Whistle-blower's Act ("FWA"), Fla. Stat. § 112.3187(9)(f) be denied. (Docs. 14, 49.) The Magistrate Judge found that Ms. Vickaryous had not shown that her complaints were not made in bad faith or for a wrongful purpose and did not otherwise include protected disclosures given their misleading nature. (Doc. 49 at 20–26.) Ms. Vickaryous objects, maintaining that the Magistrate Judge focused on irrelevant matters and construed the FWA too narrowly. (Doc. 51 at 14–19.) She downplays the inaccurate information in her complaints as harmless errors in terminology made by a layperson but maintains that the substance of her disclosures is accurate. (Id.) Ms. Vickaryous also maintains that her complaints include protected disclosures because they report acts of malfeasance, misfeasance, or gross neglect of duty. (Id. at 24.) Defendants

Mason Classical Academy, Inc. ("MCA"), Kelly Lichter, and David Bolduc have responded to Ms. Vickaryous's objections. (Doc. 52.)

After careful review of the parties' arguments, and the extensive record developed in Florida state court prior to this case's removal to this Court, the Court agrees with the Magistrate Judge and finds no error with the Report and Recommendation. Ms. Vickaryous has not shown the absence of bad faith or that she did not make her disclosures for a wrongful purpose because she has not shown her belief that MCA engaged in unlawful practices was subjectively or objectively reasonable. Further, any contention that the inaccurate and misleading statements in her complaints are due to a lack of technical precision by a layperson is belied by Ms. Vickaryous's consistent, inculpatory testimony negating an inference of harmless mistake. Accordingly, her objections (Doc. 51) are **OVERRULED** and the Report and Recommendation (Doc. 49) is **ADOPTED**.

## BACKGROUND[1]

MCA is a charter school in Collier County, Florida. (Doc. 36 at ¶ 4.) In Spring 2019, it explored switching its employee health insurance provider. (See Doc. 14-29 at 32.) During all relevant times, Ms. Lichter and Mr. Bolduc

---

[1] Ms. Vickaryous originally filed her complaint and motion for temporary reinstatement in Florida state court. (Doc. 1.) The state court held an evidentiary hearing and developed a voluminous record. (Docs. 30–34.) MCA removed the matter to this Court before the state court could resolve the motion, however. (Doc. 1.) The parties were offered an opportunity for an additional evidentiary hearing in this Court, but they declined that invitation. The Court has reviewed de novo the extensive state court record and summarizes the necessary contextual facts.

served on MCA's board.  (Doc. 14-28 at 26.)   Before his resignation, David Hull was the school's principal.  (Doc. 14-29 at 21–22.)   And Ms. Vickaryous was appointed to replace Mr. Hull in that role.  (Id. at 24, 29.)

Because Mr. Bolduc had experience in this field, indeed he operated an insurance company, he offered to "look into" different providers for MCA and discovered Captivated Health in early June 2019.  (Id. at 32, 40–45.)[2]   Mr. Bolduc scheduled meetings between Captivated Health and MCA while also attending conferences by and with the company.  (Id. at 42–44.)   Sometimes, Ms. Vickaryous accompanied Mr. Bolduc on these conferences and during these meetings with Captivated Health.  (Id.)   These interactions led Captivated Health to offer Mr. Bolduc a position with the company in November 2019 that he accepted, at least in a part-time capacity, by February 6, 2020.  (Id. at 49, 92, 138.)

In early March 2020, Ms. Lichter proposed, and MCA's board approved, a new Executive Director position to which David Hull, MCA's former principal, was appointed.  (Doc. 33-1 at 49–50.)   While Ms. Vickaryous previously occupied the "top staff member" position at MCA, Mr. Hull's Executive Director position "had supervisory authority over her."  (Doc. 14-28 at 27–28.)   Ms. Vickaryous considered this a "power play" that interfered with her duties and a "coordinated [] plan to overthrow" her with a "new position."  (Doc. 14-23 at 4.)

---

[2] Mr. Bolduc met Captivated Health through the latter's managing company, Borislow.  (Doc. 14-29 at 35, 38.)   For ease of reference, the Court will refer to Captivated Health, though Mr. Bolduc sometimes interacted solely with Borislow. Despite any legal distinctions between the two, there is no material difference between Captivated Health and Borislow's actions for the purposes of this Order.

Captivated Health appeared before MCA's board for the first time on March 23, 2020 for a presentation of its services. (Doc. 14-11.) Mr. Bolduc could not attend that meeting. (See Doc. 14-29 at 81, 97.) But the board members present unanimously voted to "mov[e] forward in next steps with Captivated Health," although what this exactly means is unclear. (Doc. 14-11 at 2; Doc. 14-29 at 81; Doc. 33-1 at 54–55.) Ms. Vickaryous commented that Captivated Health "was a good organization and [offering] a phenomenal plan." (Doc. 14-11 at 1.) Two days later, Mr. Bolduc began working for Captivated Health full time as a director. (Doc. 14-29 at 83–84.) At a March 26 board meeting, a community member who had discovered a Captivated Health press release announcing Mr. Bolduc's position brought up the matter, given Mr. Bolduc's role as a board member of MCA. (Doc. 14-14; Doc. 14-29 at 95.) This was the first time that MCA's board learned of Mr. Bolduc's employment with Captivated Health. (Doc. 14-29 at 95, 97.)

On March 27, 2020, MCA's Compliance Officer, Scott Moore, issued a notice to MCA's board raising a potential conflict of interest and reminding the board of its obligations in such a scenario under the school's governing documents. (Doc. 14-17.) The board convened on April 14 and discussed this issue. (Doc. 14-20.) Mr. Bolduc directly addressed Mr. Moore's actions because Mr. Bolduc had been working with MCA's counsel on disclosing his employment and believed Mr. Moore intentionally coordinated with Ms. Vickaryous to issue a hasty notice that undermined himself and MCA. (Id. at 3.) Mr. Moore confirmed that "he had brought it to Pam Vickaryous's attention and told her what he was going to do and

had her look over everything and said he was going to send it out." (Id. at 2.) Though one board member came to Mr. Moore's defense, others agreed with Mr. Bolduc. (Id. at 3–4.) A motion was made to find a conflict of interest as to Mr. Bolduc's employment with Captivated Health, but the motion failed. (Id. at 4–5.) Be that as it may, MCA subsequently rescinded its March 23 vote to move forward with Captivated Health and decided to remain with its current insurance provider. (Id. at 6–7.) The board also terminated Mr. Moore, effective immediately. (Id. at 8.)

Ms. Vickaryous, on April 20, 2020, filed three, materially identical whistleblower complaints with the Office of Florida's Inspector General, the Florida Commission on Ethics, and the Collier County School Board. (Docs. 14-21, 14-22, 14-23.) She claimed to have witnessed MCA's board "committing and conspiring to commit a multitude of Sunshine Law violations." (Doc. 14-23 at 2.)³ And, notwithstanding that any conflict of interest involving Captivated Health was made public by at the latest March 26, 2020, Ms. Vickaryous also alleged that Mr. Bolduc abused his position for personal financial gain as early as October 2019, "acting in dual roles as an MCA board member and as a Director at Captivated Health." (Id.) Ms. Vickaryous also stated that she "delayed implementing Captivated Health

---

³ Fla. Stat. § 286.011, commonly known as the Government in the Sunshine Law, requires that board meetings at which official acts are taken be declared and open to the public. Sarasota Citizens For Responsible Gov't v. City of Sarasota, 48 So. 3d 755, 762 (Fla. 2010).

because of the illegality of the deal [MCA's board] struck up behind closed doors." (Id.)

It is important to note that Ms. Vickaryous has previous experience with the temporary reinstatement provision of the FWA. Before joining MCA, she worked for the Collier County School Board as principal of Manatee Middle School. (See Doc. 31-9.) After she was terminated for alleged misconduct, Ms. Vickaryous sued the school board and successfully moved for temporary reinstatement under the FWA. Vickaryous v. Sch. Bd. of Collier Cnty., No. 2:18-cv-315-FtM-99MRM, 2019 WL 949303 (M.D. Fla. Feb. 27, 2019).

In all events, MCA's board held an emergency meeting on April 28 and retained outside counsel to investigate the matter. (Doc. 31-34.) The investigation revealed that, after Ms. Vickaryous filed her FWA complaints, she had intentionally and selectively deleted several MCA documents, including a critical charter agreement that was crucial to the school's upcoming renewal plans. (Doc. 33-1 at 183–216.) She had also accessed and transferred around 3,000 other MCA documents from MCA's server, moving them to an unknown location. (Id.) And when Ms. Vickaryous returned her MCA issued computers, they had been newly encrypted (thus preventing access), wiped clean, and the username changed to "mary queen of scotts." (Doc. 34-40 at 3.) The Board voted to terminate Ms. Vickaryous on June 5 and, about less than an hour later, Ms. Vickaryous filed suit in Florida state court while also moving for temporary reinstatement. (Docs. 30-2, 30-3, 34-2.)

## LEGAL STANDARD

A district judge may accept, reject, or modify a magistrate judge's report and recommendation. 28 U.S.C. § 636(b)(1). The district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." Id.

The FWA "is a remedial statute, and should be liberally construed in favor of granting access to protection from retaliatory actions." Igwe v. City of Miami, 208 So. 3d 150, 155 (Fla. 3d DCA 2016). Florida's legislature intended to prevent "retaliatory action against an employee who reports to an appropriate agency violations of law . . . that create a substantial and specific danger to the public's health, safety, or welfare." Fla. Stat. § 112.3187(2), (5). Employees who disclose information "alleging improper use of governmental office, gross waste of funds, or any other abuse or gross neglect of duty" are also entitled to protection. Id. But the FWA's protections "shall not be applicable when an employee or person discloses information known by the employee or person to be false." Id. § 112.3187(4)(c).

The FWA provides for temporary reinstatement as follows:

> Temporary reinstatement to the employee's former position or to an equivalent position, pending the final outcome on the complaint, if an employee complains of being discharged in retaliation for a protected disclosure and if a court of competent jurisdiction or the Florida Commission on Human Relations, as applicable under s. 112.31895, determines that the disclosure was not made in bad faith or for a wrongful purpose or occurred after an agency's initiation of a personnel action against the employee which includes documentation of the employee's violation of a disciplinary standard or performance

>deficiency.    This paragraph does not apply to an employee of a municipality.

Fla. Stat. § 112.3187(9)(f).

In other words, temporary reinstatement is appropriate if a movant demonstrates that: "1) prior to termination the employee made a disclosure protected by the statute; 2) the employee was discharged; and 3) the disclosure <u>was not made in bad faith or for a wrongful purpose</u>, and did not occur after an agency's personnel action against the employee."  State, Dep't of Transp. v. Fla. Comm'n on Hum. Rels., 842 So. 2d 253, 255 (Fla. 1st DCA 2003) (emphasis added).

## DISCUSSION[4]

As an initial matter, Ms. Vickaryous argues that the Magistrate Judge focused his analysis on wholly irrelevant matters bearing no "relevance as to Ms. Vickaryous's employment with the Defendant, other than to try to demonstrate to the reader that . . . Ms. Vickaryous was the villain in this story."  (Doc. 51 at 12.) Put differently, Ms. Vickaryous contends that the Magistrate Judge "impermissibly expand[ed] the scope of the instant inquiry" by focusing on her conduct before and after she filed her complaints, which purportedly amounts to an "irrelevant character assassination of Ms. Vickaryous."  (Id. at 2, 13.)   But this argument is unpersuasive for at least one major reason.

---

[4] Because this concerns a preliminary question, Ms. Vickaryous need only make an initial showing; the Court's findings are for the purposes of whether temporary reinstatement is warranted only and are not binding as to the merits of the FWA claim.  See Broward Cnty. Sheriff's Off. v. Hamby, 300 So. 3d 213, 217 n.2 (Fla. 4th DCA 2020).

"In analyzing a retaliation claim under the FWA, courts use the Title VII burden-shifting method of proof." Castro v. Sch. Bd. of Manatee Cnty., Fla., 903 F. Supp. 2d 1290, 1302 (M.D. Fla. 2012) (citing Sierminski v. Transouth Fin. Corp., 216 F.3d 945, 950 (11th Cir. 2000)). "A complaint is protected if the complainant demonstrates a 'good faith, reasonable belief that the employer engaged in unlawful employment practices. It is critical to emphasize that a plaintiff's burden has both a subjective and objective component.'" Id. (quoting Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir.1997)). The totality of Ms. Vickaryous's actions—including her conduct before and after her disclosures—is therefore directly relevant to her motion insofar as it demonstrates whether she acted in good faith. Thus, the Court finds no error with the scope of the Magistrate Judge's inquiry.

Additionally, the Magistrate Judge did not err in finding that Ms. Vickaryous acted in bad faith or for a wrongful purpose and that her complaints were not protected because they contained inaccurate and misleading information. Ms. Vickaryous argues that no other court has seemingly ever denied a motion for temporary reinstatement "based on bad faith." (Doc. 51 at 10 & n.11.) To be fair, the Court was unable to find any decisions directly addressing this issue but nevertheless is not persuaded that doing so would amount to a "miscarriage of justice," as Ms. Vickaryous asserts. (Id. at 10.) "No part of a statute, not even a single word, should be ignored, read out of the text, or rendered meaningless, in construing the provision" because Florida's legislature "does not intend to enact

useless provisions, and courts should avoid readings that would render a part of a statute meaningless." Scherer v. Volusia Cnty. Dep't of Corr., 171 So. 3d 135, 139 (Fla. 1st DCA 2015) (quotation omitted). Here, the legislature expressly conditioned temporary reinstatement on a finding that "the disclosure was not made in bad faith or for a wrongful purpose." Fla. Stat. § 112.3187(9)(f). Simply put, Ms. Vickaryous's argument would force the Court to abdicate its duties and misconstrue the FWA.

Though the FWA does not define "bad faith," Florida courts understand that phrase as the "opposite of 'good faith', generally implying or involving . . . a design to mislead or deceive another . . . or sinister motive. . . . [contemplating] a state of mind affirmatively operating with a furtive design or some motive of interest or ill will." Bosso v. Neuner, 426 So. 2d 1209, 1212 (Fla. 4th DCA 1983) (quoting Bad Faith, Black's Law Dictionary (4th ed.)). And, as noted, Ms. Vickaryous bears the burden of demonstrating a reasonable subjective and objective belief that MCA engaged in unlawful practices. Little, 103 F.3d at 960. True, an employee need not "prove [that] the underlying . . . conduct that he opposed was actually unlawful." Id. (emphasis added). But in expanding on these subjective and objective beliefs, the Eleventh Circuit has explained:

> A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

Id. (emphasis in original).

The Eleventh Circuit's analysis in Little demonstrates why the Magistrate Judge correctly determined that Ms. Vickaryous fails to demonstrate the absence of bad faith or wrongful purpose. There, the court found implausible an employee's assertion that he reasonably believed his employer had violated Title VII. Id. The employee had overheard a deplorable racial slur but "did not report the remark to either a supervisor or manager until approximately eight months later." Id. at 958. The employer conducted a meeting with the employee and the individual who made the remark, noted such conduct was unacceptable, and maintained it "would not tolerate racially offensive speech." Id. Still, the employee contended that "he was harassed continually from this point forward in retaliation for having complained about" the slur. Id. Notwithstanding the remedial nature of the statute, the Eleventh Circuit held that "based on the particularized facts of this case, [the employee] did not have an objectively reasonable belief that he was opposing an unlawful employment practice." Id. at 960.

Again, turning to the thorough and well-developed record before the Court, the inescapable conclusion is that Ms. Vickaryous cannot plausibly claim for the purposes of temporary reinstatement that her beliefs (as proffered in her complaints) were subjectively or objectively reasonable under these facts. For example, despite claiming that she "[had] evidence that date[d] back to June 2019 that Mr. Bolduc was involved with Captivated Health," Ms. Vickaryous did not submit her complaints until April 2020. (Doc. 31-30 at 4.) Ms. Vickaryous was no

stranger to whistleblower reports, having already utilized the FWA in February 2019, meaning this delay and its surrounding circumstances call into question her subjective beliefs.  Vickaryous, 2019 WL 949303, at *5.  In fact, Ms. Vickaryous even testified that, after Mr. Moore was terminated, she believed that "[she] was next [to be terminated by MCA], which is why [she] sent the complaint."  (Doc. 31-30 at 37 (emphasis added).)  Later, she would claim "[t]hat was one of the reasons [she] wrote the complaint" but "[t]hat wasn't the only reason."  (Doc. 33-1 at 115.)  The Court finds this incredulous at best.  Ms. Vickaryous's allegations that Ms. Lichter and the board interfered with public records requests aptly demonstrates why.  Mr. Hull emailed Ms. Vickaryous on April 9, 2020 to discuss MCA's procedures for handling those requests.  (Doc. 34-11 at 3.)  Ms. Vickaryous, only eleven days before she would file her complaints contradicting this statement, responded that such a discussion was "not a top priority" as the "work [was] being done correctly and thoroughly" by Mr. Moore.  (Id. at 2.)

And, as to Ms. Lichter "ordering the delay on responding to and fulfilling valid public records requests," Ms. Vickaryous's testimony negates any finding of reasonableness.  (Doc. 14-23 at 2.)  Ms. Vickaryous identified an email from Ms. Lichter stating that, "all new records requests will take time in light of everything going on."  (Doc. 31-30 at 37.)  Despite MCA dealing with and adjusting its procedures during the height of the COVID-19 Pandemic, Ms. Vickaryous characterized this as Ms. Lichter "asking us to. . . basically telling us the way—the manner in which we should go about public records requests . . . to make sure

people know it's going to take more time."  (Id.)   Yet Ms. Vickaryous saw no issue with Mr. Moore taking four months to respond to a request, seemingly supporting Ms. Lichter's observation.   (Id.)

Contrary to her contentions, the record clearly supports the Magistrate Judge finding that Ms. Vickaryous's complaints contained inaccurate, misleading, or false information that amounted to more than simply "one potentially inaccurate statement."   (Doc. 51 at 17.)   She was present at the March 26 and April 14, 2020 MCA board meetings at which Mr. Bolduc's employment with Captivated Health was detailed and explored.   Given that he did not start working for the company until February 2020 and did not become a director until March 25 at the latest, Ms. Vickaryous cannot reasonably claim he was acting in dual roles as early as October 2019.   And Ms. Vickaryous's assertion that she "delayed implementing Captivated Health because of the illegality of the deal" is neither accurate, nor a mistake. (Doc. 14-23 at 2.)   On April 11, Ms. Vickaryous sent MCA's board an email discussing other insurance providers and recounted that during the March 23 "board meeting, [she] asked the board to wait on making a" decision over Captivated Health.   (Doc. 31-20 at 1.)   Yet when Ms. Vickaryous was confronted with this statement six days before filing her complaints at the April 14 meeting by incredulous MCA board members, Ms. Vickaryous conceded that "rather than a request being made, she actually made round-about comments and inferences, 'per se.'"   (Doc. 14-20 at 6.)

The Court could identify numerous other examples that speak directly to the unreasonableness of Ms. Vickaryous's beliefs. For example, Ms. Vickaryous claimed Ms. Lichter violated the Sunshine Law by hiring Mr. Hull without following appropriate procedures as a "power play . . . to overthrow the school's principal," despite later testifying that she "did not look at [Mr. Hull] as a challenge." (Doc. 33-1 at 52; Doc. 14-23 at 4.) The Court could also note that Ms. Vickaryous claimed that she was "hopeful [the board] would find that there was a conflict of interest" at the March 23 meeting, despite commenting that Captivated Health "was a good organization and a phenomenal plan" at the very same meeting. (Doc. 33-1 at 66; Doc. 14-11 at 1.)

Suffice it to say, Defendants correctly note that these "are not the actions of a good faith, altruistic whistleblower" that the FWA was intended to protect. (Doc. 52 at 10.) Ms. Vickaryous only acted after she believed her own employment was in jeopardy and crafted a misleading narrative, given that most of her allegations are severely undermined or directly contradicted by the record evidence predating her disclosures. Even accepting that the nature of information disclosed in Ms. Vickaryous's complaints satisfy section 112.3187(5), Ms. Vickaryous has not shown error with the Magistrate Judge's findings.

For these reasons, the Court finds that the Magistrate Judge did not err in recommending that Ms. Vickaryous's motion for temporary reinstatement be denied. The Court's adoption of the Report and Recommendation and other statements in this Order strictly pertain to the question of whether temporary

reinstatement is appropriate here under Florida law.  As discovery moves along and more is learned, the merits of the case may ferret out another way.  Based on the instant record before the Court, however, temporary reinstatement is unwarranted.  Whether Ms. Vickaryous will ultimately prevail remains to be seen.[5]

Accordingly, it is **ORDERED**:

1. Ms. Vickaryous's objections (Doc. 51) are **OVERRULED**.

2. The Report and Recommendation (Doc. 49) is **ADOPTED** and made part of this Order for all purposes.

3. The motion for temporary reinstatement (Doc. 14) is **DENIED**.  The Court's findings and conclusions are without prejudice to either party's ability to prosecute or defend this matter, limited solely to the motion sub judice.

4. To the extent Defendants request "their attorney's fees and costs as the prevailing party pursuant to Fla. Stat. § 112.3187(9)(d)" at this juncture rather than when final judgment is entered, (Doc. 52 at 19), that request is **DENIED WITHOUT PREJUDICE** to Defendants renewing that request, if appropriate.  Should Defendants seek attorney's fees and costs before final judgment, any motion should discuss why such an award would be appropriate before the Court makes a final determination over Ms. Vickaryous's claims.

---

[5] The Court notes that the tone of the parties' briefing is disturbing to the Court.  Advocates must advocate for their clients.  But it is unnecessary to poke at each other or break into colloquial-style phrasing.  It does not help.

See Anderson v. City of Crystal River, Fla., 219 F. App'x 901, 903 (11th Cir. 2007) (affirming district court's denial of motion for costs and fees under FWA).

**ORDERED** at Fort Myers, Florida, on September 26, 2022.

_____
JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE